UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| TRBR, INC., d/b/a SUPERIOR BUICK GMC and TRBR II, INC., d/b/a/ SUPERIOR BUICK, | |
| Plaintiffs, | Case No. 20-11269 Honorable Laurie J. Michelson |
| v. | |
| AMERICREDIT FINANCIAL SERVICES, INC., d/b/a GM FINANCIAL, and GENERAL MOTORS, LLC, | |
| Defendants. | |

---

**ORDER GRANTING IN PART AND DENYING IN PART
GENERAL MOTORS' MOTION TO DISMISS [19]**

---

Plaintiffs are two auto dealerships that sell Buicks and GMCs: TRBR, Inc. and TRBR II, Inc., doing business as Superior Buick GMC and Superior Buick, respectively. The two defendants are Americredit Financial Services, Inc., which provides financing to dealerships as GM Financial ("GMF"), and General Motors, LLC ("GM"), the manufacturer and distributor of the cars to the dealerships.

Plaintiffs assert more than sixteen counts, ranging from race discrimination to antitrust to breach of contract. (ECF No. 13.) They allege that General Motors and GMF worked together to undermine their dealerships in violation of state and federal law. Plaintiffs say that GM and GMF accused them of abusing family discount programs for GM employees, former employees, and their families (formally called the "Vehicle Purchase Program" or "VPP" program). (ECF No. 13, PageID.85–86.) They allege that GM then imposed enhanced verification procedures for VPP customers that relied on improper racial stereotypes, for example, that related family members

would have the same last name or skin tone. (*Id.*) Plaintiffs allege this damaged their business, ultimately causing GMF to terminate their financing agreements and preventing Plaintiffs from ordering new inventory through GM (*id.* at PageID.90–91).

GM moves to dismiss Plaintiffs' claims with prejudice for failure to state a claim. (ECF No. 19.) For the reasons given below, the Court grants GM's motion to dismiss with respect to all claims except Plaintiffs' claims under the Automobile Dealer's Day in Court Act and the Sherman Act.

## I. Background

Defendants GM and GMF are subsidiaries of General Motors Corporation. (*See* ECF No. 15, 18.) GM manufactures and distributes motor vehicles. (*Id.* at PageID.80.) GMF is a financial services company that provides inventory financing that enables dealers to buy motor vehicles to hold in inventory, a commercial financing arrangement called "dealer floor plan financing." (*Id.* at PageID.80.)

Plaintiffs TRBR and TRBR II own and operate automobile dealerships for General Motors. (ECF No. 13, PageID.81.) The shareholders for TRBR and TRBR II are Basam Robin and Tanya Robin, who are Arab Americans of Chaldean heritage. (*Id.* at PageID.82.) (It appears from the record that the Robins are the sole shareholders of both companies, although they do not state so explicitly.)

As Plaintiffs recount in their complaint, TRBR entered into a franchise agreement with GM for a dealership in Dearborn, Michigan on January 15, 2015 (the "TRBR Dealer Agreement"). (*Id.* at PageID.81.) GMF extended credit for TRBR to buy vehicles for the dealership through a Master Loan Agreement and other loan documents signed by TRBR on November 1, 2016 (the "Master Loan Agreement" or "MLA"). (*Id.* at PageID.82; ECF No. 16-1.)

Plaintiffs expanded to a second location the following year. On November 17, 2017, TRBR II entered into a franchise agreement with GM for a dealership in Battle Creek, Michigan (the "TRBR II Dealer Agreement"). (ECF No. 13, PageID.81.) Plaintiffs executed an Addendum to the Master Loan Agreement and other loan documents with GMF for dealer floor plan financing at the second dealership (the "Addendum"). (ECF No. 13, PageID.82.)

After opening their Dearborn dealership in 2015 and Battle Creek dealership in 2017, Plaintiffs received a number of awards, including GM Buick and/or GMC Dealer of the Year Award in 2015, 2016, and 2017, as well as other awards for sales volume. (ECF No. 13, PageID.83.)

Plaintiffs allege that problems began in February 2019, when Defendants "commenced an illegal scheme" to "discriminate and harm plaintiffs." (*Id.*) At the end of February 2019, Plaintiffs ordered thirty Yukon trucks from GM, but delivery was delayed two months by flooding. (*Id.* at PageID.84.) Despite the delay in automobile delivery, which then delayed payment by TRBR customers for their new vehicles, GMF demanded immediate payment. (*Id.*) Plaintiffs were late on the payment, known in the auto industry as being "out of trust." (*Id.*) On May 21, 2019, GMF attempted to collect a bank draft, but the request was returned for insufficient funds. (*Id.*) GMF imposed an interest rate increase and stricter payment requirements on Plaintiffs. (*Id.*) Plaintiffs allege that as a result, they were "unable to do business, purchase vehicles, provide service or access [their] open accounts." (*Id.* at PageID.85.)

Plaintiffs turned to GM for help, but, they say, were met with discrimination. Representatives for TRBR and TRBR II met with five GM executives on May 23, 2019, in Detroit. (*Id.*) At the meeting, Plaintiffs allege, GM executives Steven Fahner and Philip Lickman "raised . . . certain issues . . . concerning the plaintiffs' compliance with a GM employee family discount

program." (*Id.*) As noted above, the family discount plan is open to active and retired GM employees and their families. (*Id.*) Plaintiffs allege that at the meeting, Fahner and Lickman stated "several times" that Plaintiffs sold "too many cars to Arabs with GMS codes from aunts and uncles." (*Id.* at PageID.86.) The two GM executives also expressed doubt that certain customers could be related if they did not also have an Arabic last name. (*Id.*) According to Plaintiffs, at the end of the meeting Fahner essentially said to Lickman: "If I'm white and you are black, that is an automatic reason to question whether you qualify for the VPP [on the basis of a family relationship]." (*Id.*) One of the executives handed Plaintiffs a letter stating the Dearborn dealership was in breach of the Dealer Agreement (the TRBR Dealer Agreement) for alleged violations of the VPP program. (*Id.*) (The amended complaint alleges that Plaintiffs received this notice for the Dearborn dealership only. (*See* ECF No. 13, PageID.86.))

The letter imposed new verification procedures for the Dearborn dealership to provide the VPP family discount. (*Id.*) The new procedures required interested customers to provide a birth certificate, marriage certificate, or other documents to prove their relationship to the employee discount holder. (*Id.*)

Plaintiffs contested GM's allegations of misusing the family discount in a letter dated June 21, 2019. Plaintiffs "acknowledged that there may have been some prior deficiencies by certain of their salespeople and other staff with regard to the family discount and other discount plans, which were uncovered in 2018." (*Id.* at PageID.86–87.) But Plaintiffs insisted that the "issue had been corrected and more closely monitored." (*Id.* at PageID.87.) Plaintiffs' letter also explained their concern that the new verification procedures would be intimidating and have a disparate impact on their customers, who felt insulted and targeted on the basis of their national origin and ethnicity.

(*Id.*) Plaintiffs state they received no response. (*Id.*) They sought to raise their concerns with more senior GM personnel but received a "cursory denial." (*Id.* at PageID.88.)

Plaintiffs allege (on information and belief) that "other than [their] two dealerships, no other GM dealership was required to comply with this unfair and targeted verification process." (*Id.*) They allege that "[a]s a result of this discriminatory and illegal verification process . . . the loss of customers and sales was immediate." (*Id.*) The change was so significant that GM called to ask why monthly sales of new vehicles fell from 281 vehicles in June 2018 to 66 vehicles in June 2019. (*Id.*)

At some point after GM imposed the new verification methods for the VPP program, GMF advised Plaintiffs that they were behind on payments and stopped financing new inventory. (*Id.* at PageID.89.) But Plaintiffs state that GMF "eventually funded" some vehicles, and then acknowledged that "the error was on [its] end." (*Id.*)

Nature then intervened. Around June 1, 2019, a severe hailstorm damaged 100 percent of the inventory at the Battle Creek dealership. (*Id.* at PageID.90, 91.) Plaintiffs allege that GM and GMF were aware of the damage. (*Id.* at PageID.90.)

On June 6, 2019, GMF notified TRBR and TRBR II that it was terminating all future borrowing pursuant to Section 18.2 of the MLA and Addendum, effective August 6, 2019. (*Id.*) That provision allows the Lender to terminate future borrowing "at any time and for any or no reason." (ECF No. 16-1, PageID.172.) GMF demanded payment of all outstanding obligations by October 7, 2019, and later allowed an extension until February 2020. (ECF No. 13, PageID.90.)

Plaintiffs found four potential replacement lenders, but none would provide financing without proof that Plaintiffs' default had been cured. (*Id.* at PageID.91.) Plaintiffs do not explain when this default occurred, or whether it was related in any way to the default that they allege was

GMF's mistake. (*See id.*) Plaintiffs allege they were "shut off" by GM and "unable to order new vehicles or parts." (*Id.* at PageID.91.) But it is not clear from the pleadings whether they attribute this to GMF's termination of financing, the consequences of the new VPP verification requirements, or some other factor.

According to Plaintiffs, GM continued to act in bad faith. GM agreed to buy the Battle Creek dealership and the damaged inventory from TRBR II, but then "cancelled the sale on the last day possible" under the purchase agreement. (*Id.*) As a result of the cancellation, TRBR II incurred two months of operating expenses with no income to cover the costs. (*Id.* at PageID.91.)

Despite all this, Plaintiffs and GM have continued their franchise relationship. (*Id.* ("[T]he Dealer Sales and Services Agreements between GM and Plaintiffs have not been terminated by GM.").) And although their financing arrangement is unclear, Plaintiffs continue to operate both the Dearborn and Battle Creek dealerships. (*Id.* at PageID.79 ("TRBR was and still is engaged in the business of operating an automobile dealership selling, among other thigs, Buick and GMC automobiles."); *id.* at PageID.80 ("TRBR II was and still is engaged in the business of operating an automobile dealership selling, among other things, Buick automobiles.").)

Plaintiffs filed this suit on May 21, 2020, asserting 16 counts against both GM and GMF. (ECF No. 1.) Against General Motors only, Plaintiffs assert a claim of race discrimination under 42 U.S.C. § 1981 (Count XV). (*See* ECF No. 13, PageID.111, 122.) And against both Defendants, Plaintiffs assert six claims under the Michigan Motor Vehicle Franchise Act (Counts I–VI), a claim under the Federal Automobile Dealer's Day in Court Act (Count VII), a Sherman Act claim (Count VIII)[1], a claim under the Michigan Elliott-Larsen Civil Rights Act (Count XVI), and claims for

---

[1] The heading of the claim suggests it is against GM only, but the allegations appear to be against both Defendants, which is to be expected in a conspiracy claim.

breach of contract (Counts IX, X), breach of good faith and fair dealing (Counts XI, XII), and tortious interference (Counts XIII, XIV)). (ECF No. 13.) (Plaintiffs formally withdrew the Elliott-Larsen claim in response to GM's motion to dismiss. (ECF No. 24, PageID.477, n.1).)

General Motors moves to dismiss all 16 claims against it. (ECF No. 19.) GM also presents a different view of the facts. GM alleges that Plaintiffs "flagrantly violated GM vehicle discount programs to cheat GM and other GM dealers," and now, "[c]aught, Plaintiffs have launched a 16-count, 220-paragraph Complaint in an effort to pressure GM to accept their separate, ongoing breaches of the parties' dealer agreements." (ECF No. 19, PageID.254.) But on a motion to dismiss, the Court accepts the factual allegations in Plaintiffs' complaint as true and draws reasonable inferences from those allegations in Plaintiffs' favor. *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

(The Court notes that GMF also previously filed a motion to dismiss for failure to state a claim (ECF No. 17), but the Court dismissed that motion as premature pending a resolution of whether arbitration was the proper forum for the dispute (ECF No. 20). With another order entered today, the Court granted GMF's motion to strike the jury demand and granted leave for GMF to re-file their motion to dismiss. (ECF No. 30.)

With that background, the Court turns to GM's motion to dismiss. The parties' positions are briefed adequately and the motions can be decided without further argument. E.D. Mich. LR 7.1(f).

## II.  Legal Standard

The Court "construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Heinrich v.*

*Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (cleaned up). Detailed factual allegations are not required to survive a motion to dismiss, *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012), but they must "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient." *HDC*, 675 F.3d at 614 (quoting *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008)). At this stage, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

## III.  Analysis

Because Plaintiffs' three federal claims are the basis of this Court's subject matter jurisdiction, the Court begins with those claims first.

### A.  The Automobile Dealer's Day in Court Act (Count VII)

Plaintiffs bring this claim against both Defendants. (ECF No. 13, PageID.110.) The ADDCA provides: "An automobile dealer may bring suit against any automobile manufacturer engaged in commerce" and shall recover damages for "failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222.

GM argues that Plaintiffs have failed to state an ADDCA claim because they have not identified any term or provision of the franchise agreement that was allegedly breached. While GM is correct that Plaintiffs have not identified any specific contractual breach by GM or GMF,

GM has not cited any authority for the proposition that alleging breach of contract is necessary to state a claim under the ADDCA.

Indeed, "There are four elements of an ADDCA cause of action: (1) the plaintiff must be an automobile dealer; (2) the defendant must be an "automobile manufacturer" engaged in commerce; (3) there must be a manufacturer-dealer relationship embodied in a written franchise agreement; and (4) the plaintiff must have been injured by the defendant's failure to act in good faith." *Maschio v. Prestige Motors*, 37 F.3d 908, 910 (3d Cir. 1994); *see also George Lussier Enterprises, Inc. v. Subaru of New England, Inc*., 393 F.3d 36, 46 (1st Cir. 2004) ("to state a claim . . . [i]t is enough that dealers offer evidence that the manufacturer or distributor made a wrongful demand coupled with threats of sanctions, such as withholding vehicles that dealers are legally entitled to receive. . . . ); *Gen. Motors Corp. v. New A.C. Chevrolet, Inc*., 263 F.3d 296, 304 (3d Cir. 2001) ("while a manufacturer does not make a wrongful demand if it merely insists that the dealer comply with a reasonable obligation imposed by the franchise agreement, a dealer can state a claim for relief under the ADDCA by alleging that the manufacturer's reliance on those objectively reasonable provisions is, in fact, motivated by a pretextual, bad-faith reason."); *Empire Volkswagen Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 95 (2d Cir. 1987) ("In order to succeed on a Dealers' Act claim, the dealer must demonstrate that the manufacturer exercised coercion or intimidation or made threats against the dealer to achieve an improper or wrongful objective") (citations omitted). So Plaintiffs' failure to allege a breach of contract does not undermine their ADDCA claim.

Plaintiffs must, however, allege "coercion or intimidation" in order to allege that GM has failed to act in good faith under the ADDCA. *Fray Chevrolet Sales, Inc. v. General Motors Corp*., 536 F.2d 683, 685 (6th Cir. 1976). As the Sixth Circuit has explained, the ADDCA applies a

"specialized definition of good faith." *Hall v. Ford Motor Co.*, 68 F.3d 474, 1995 WL 619972, at

*1 (6th Cir. 1995) (unpublished table opinion). The ADDCA defines good faith as the duty "to act

in a fair and equitable manner toward each other so as to guarantee the one party freedom from

coercion, intimidation, or threats of coercion or intimidation from the other party." 15 U.S.C. §

1221(e). Given this definition, "a dealer can succeed in a claim under the Act only by proving that

it sustained damages as a result of coercion or intimidation by the manufacturer." *Hall*, 68 F.3d

474, 1995 WL 619972, at *1 . "Coercion or intimidation must include 'a wrongful demand which

will result in sanctions if not complied with.'" *Id.* (quoting *Fray Chevrolet Sales*, 536 F.2d at 685).

> Plaintiffs allege Defendants acted in bad faith in five ways:
>
> (a) pretextually terminating plaintiffs' dealer floor plan financing, (b) terminating plaintiffs' dealer floor plan financing and failing to provide plaintiffs with a sufficient and commercially reasonable time period in which to obtain and locate alternative dealer floor plan financing, (c) failing to assist plaintiffs in obtaining floor plan financing by refusing to confirm that the alleged default had been resolved, (d) demanding and coercing plaintiffs to use a verification program for its VPP customers which was racist, discriminatory and resulted in disparate treatment of plaintiffs and their customers by reason of their race and ethnicity, and (e) disparately treating plaintiffs, all in violation of [the ADDCA].

(ECF No. 13, PageID.111 (emphasis added).)

The Court finds that the fourth claim comes close enough to "a wrongful demand which

will result in sanctions if not complied with" to plausibly allege a violation of the ADDCA.

Specifically, Plaintiffs allege that GM (and GMF) "demand[ed] and coerc[ed] plaintiffs to use a

verification program for its VPP customers which was racist." (ECF No. 13, PageID.111.) Under

the new verification procedures imposed in June 2019, Plaintiffs allege they were not permitted to

self-authenticate a customer's eligibility as a GM employee, former employee, or family member;

Plaintiffs' sales team was required to obtain "personal, private, and protected information from

their customers" in order to verify eligibility, and Plaintiffs were required to submit that material

to GM for approval to process the VPP pricing. (*Id.* at PageID.104.) Plaintiffs allege that the standards of review to evaluate this material was "racist" based on the comments GM executives made at the time that they imposed the new procedures, e.g., "If I'm white and you are black, that is an automatic reason to question whether you qualify for the VPP [on the basis of a family relationship]." (*Id.* at PageID.86.) Coupled with "failing to assist" Plaintiffs with their financing troubles, which Plaintiffs allege was caused by GMF's repeated mistakes, Plaintiffs' complaint alleges that GM improperly demanded that they use a discriminatory verification process on threat of loss of financing.

GM attempts to offer evidence that Plaintiffs had abused the family discount program and that the verification methods were entirely proper. (ECF No. 19-2, PageID.286.) But that evidence cannot be considered at this stage. And although Plaintiffs admit in their complaint that there were at least some "deficiencies" in their use of the family discount program (ECF No. 13, PageID.86–87), that does not negate Plaintiffs' claim as a matter of law, especially given their allegation that the issue was corrected.

GM points to case law in other jurisdictions where courts have found that distributors may condition dealers' access to vehicles. *See, e.g.*, *George Lussier*, 393 F.3d at 44 ("We simply fail to see how [the distributor's] practice of conditioning access to, or accessorizing, discretionary and turndown cars—cars which dealers concede they had no contractual right to receive—constitutes coercion."). But that case did not include an allegation of "conditioning access" through a procedure that implicates a protected characteristic. Discovery may well vindicate GM, but at this stage, obliged to take the Plaintiffs' allegations as true, the Court finds GM has not shown that Plaintiffs' claim is barred as a matter of law.

Taking the facts in the light most favorable to Plaintiffs, it is at least plausible that GM demanded Plaintiffs use a verification system that relies on racially discriminatory standards to evaluate family relationships—for example, a default rule that married couples and their children should share the same last name or even skin color. If so, then it is plausible that GM failed to act in a fair and equitable manner toward Plaintiffs so as to guarantee Plaintiffs freedom from coercion, intimidation, or threats of coercion or intimidation. *See* 15 U.S.C. § 1221(e). GM has not shown any other way that Plaintiffs' ADDCA is deficient as a matter of law.

The Court therefore finds that Plaintiffs have stated a plausible claim under the ADDCA against GM and denies GM's motion to dismiss with respect to Count VII.

### B.  Sherman Act (Count VIII)

Plaintiffs' second federal claim is for restraint of trade under the Sherman Act, 15 U.S.C. § 1, et seq. They allege that "defendants have conspired and/or agreed to put Plaintiffs out of business and/or force the distress sale of their dealerships" and "eliminate plaintiffs' dealerships and franchises with GM." (ECF No. 13, PageID.113.) (The Court again notes that all of Plaintiffs' allegations presented with their Sherman Act claim describe conduct by "defendants," but they assert the claim "against General Motors." (*See id.* at PageID.113–114.)) Plaintiffs allege that in furtherance of this conspiracy, Defendants "pretextually terminated plaintiffs' dealer floor plain financing," failed to provide "a sufficient and commercially reasonable time" to find alternative financing, and "coerced plaintiffs to use a racially discriminatory verification program for its VPP customers." (*Id.* at PageID.113–114.)

GM seeks dismissal on the grounds that it and its alleged co-conspirator, GMF, are wholly-owned subsidiaries of the same corporate parent. The law supports GM's argument: the Sixth Circuit has held that "sister companies with the same parent" are "incapable, as a matter of law, of

conspiracy." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 (6th Cir. 2008). And Plaintiffs agree that this is the law. (ECF No. 24, PageID.498.)[2]

But Plaintiffs correctly point out that, on the present record, GM has not demonstrated that both GM LLC and GMF are wholly-owned by General Motors Corporation. (*Id.*) GM offers two sources. (A district court may consider corporate disclosures on a motion to dismiss. *See Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 (6th Cir. 2008); *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (a court may consider public records on a motion to dismiss).

First, a Securities & Exchange Commission Form 10-K shows that General Motors LLC (GM) and AmeriCredit Consumer Loan Company, Inc. (GMF) are corporate siblings owned by the same parent company, General Motors Company. (ECF No. 19-3, PageID.296–297.) But the Form 10-K does not state that they are *wholly*-owned by GMC. It lists them as "subsidiaries and joint ventures," meaning that they could be jointly owned with another entity or not necessarily 100% owned subsidiaries. (*See id.*) Second, GM offers its Rule 7.1 corporate disclosures. GM's disclosure confirms that it is "wholly-owned" by General Motors Company. (ECF No. 15, PageID.135.) But GMF's does not. GMF's disclosure states that General Motors Company is its "parent corporation," listing no other parent or affiliate. (ECF No. 18, PageID.240.) But again, this does not necessarily mean the parent wholly owns the subsidiary.  And GM does not address this issue in its reply brief. So GM has not shown that Plaintiffs' Sherman Act claim is barred as a matter of law based on the Defendants' corporate relationship.

---

[2] The law is also clear that a parent and its wholly-owned subsidiary are considered a single entity and thus cannot conspire for purposes of the Sherman Act. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). Plaintiffs allege that "GMF is the wholly owned captive finance subsidiary of GM." (ECF No. 13, PageID.81, 113.) But this is not the basis of GM's motion to dismiss.

The answer to this question of fact, however, will not be difficult. So the Court will encourage the parties to engage in early discovery to address whether these Defendants are both wholly-owned by General Motors Corporation and, if warranted, will allow an early motion for summary judgment that would not preclude a later motion on other claims.

### C.  Equal Rights in Contracting (Claim XV)

Plaintiffs bring this claim against GM only. (ECF No. 13, PageID.122.) They allege that GM discriminated against them in enforcing their contract because they are Arab Americans of Chaldean heritage, in violation of 42 U.S.C. § 1981.

A plaintiff asserting a claim under § 1981 "bears the burden of showing that race was a but-for cause of its injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). "Under this standard, a plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred." *Id.*

Plaintiffs attempt to dismiss this authority as "word games" and try to distinguish *Comcast* as an employment dispute. (ECF No. 24, PageID.511.) But the Supreme Court did not restrict its reasoning to employment cases. The Court was unequivocal: "All the traditional tools of statutory interpretation persuade us that § 1981 follows the usual rules, not any exception. To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast*, 140 S. Ct. at 1019.

Plaintiffs do not dispute that they have not alleged but-for causation for their § 1981 claim. (ECF No. 24, PageID.508–511.) As a result, Plaintiffs have failed to state a claim under 42 U.S.C. § 1981 and that claim is dismissed.

\*

14

Because Plaintiffs' federal ADDCA claim survives, the Court will turn to the supplemental state law claims. Plaintiffs assert all their state law claims against both GM and GMF. This opinion addresses only the claims against GM.

### D.  Michigan Motor Vehicle Franchise Act (Counts I–VI)

Plaintiffs assert four claims (against both Defendants) under the Michigan Motor Vehicle Franchise Act, Mich. Comp. Law § 445.1561, *et seq*. Counts I and II are based on Section 445.1567(1), which addresses cancellation of a dealer agreement. Counts III and IV are based on Section 445.1574(1)(e)(ii), which prohibits an auto manufacturer from offering different dealerships any incentives or promotions "without making the offer available to all" dealers. And Count V is based on Section 445.1574(1)(m), which provides that a manufacturer shall not "unfairly prevent a new motor vehicle dealer that sells, transfers, or exchanges a new motor vehicle dealership from receiving reasonable compensation for the value of the new motor vehicle dealership." As the Court will explain, Plaintiffs have not stated a claim for any of these provisions.

### 1.  Cancellation (Counts I, II, VI)

The Motor Vehicle Franchise Act provides that a manufacturer "may not *cancel, terminate, fail to renew, or refuse to continue* any dealer agreement with a new motor vehicle dealer" unless the manufacturer gives the requisite statutory notice, acts in good faith, and has good cause for the termination. Mich. Comp. Law § 445.1567(1) (emphasis added).

Because Plaintiffs have not alleged that GM cancelled or terminated a dealer agreement, Plaintiffs have not stated a claim for cancellation under the Motor Vehicle Franchise Act. At most, Plaintiffs allegations show that GM has imposed additional conditions on the VPP discount program. Plaintiffs expressly state in their amended complaint that GM has not terminated any franchise agreement. (ECF No. 13, PageID.91 ("[T]he Dealer Sales and Services Agreements

between GM and Plaintiffs have not been terminated by GM."); *id.* at PageID.79 ("TRBR was and still is engaged in the business of operating an automobile dealership selling, among other thigs, Buick and GMC automobiles."); *id.* at PageID.80 ("TRBR II was and still is engaged in the business of operating an automobile dealership selling, among other things, Buick automobiles.").)

Plaintiffs respond that GM's new verification requirements to continue the VPP discount constitutes constructive termination of a "dealer agreement" under the Motor Vehicle Franchise Act because it has caused Plaintiffs' sales to decline. (ECF No. 24, PageID.487.) Plaintiffs cite to authorities outside this jurisdiction that have recognized "constructive termination" of franchise agreements in other states. (*See* ECF No. 24, PageID.488 (citations omitted).) But Plaintiffs do not identify any authority to support this "constructive termination" theory under the Michigan Motor Vehicle Franchise Act or Michigan law generally. (Plaintiffs do cite to several *employment* cases addressing constructive termination, but this Court will not venture to expand the application of the Michigan Motor Vehicle Franchise Act by analogy to employment disputes—that is a question of Michigan law for Michigan courts.) And more generally, the Supreme Court has ruled that constructive termination of a franchise agreement requires a *plaintiff* to terminate the relationship, not the defendant. *See Shell Serv., Inc. v. Shell Oil Prod. Co. LLC*, 559 U.S. 175, 185 (2010).

Because Plaintiffs have alleged that their dealer agreements with GM are still fully in force, and Plaintiffs have not offered any authority to support a "constructive termination" theory of liability based on changes to the VPP discount program, Plaintiffs have failed to state a claim against GM under Section 445.1567(1) of the Michigan Motor Vehicle Dealer Act. Counts I, II, and VI are dismissed as to GM.

## 2.  Selective Promotional Offerings (Counts III, IV)

Section 445.1574(1)(e)(ii) of the Michigan Motor Vehicle Dealer Act prohibits an auto manufacturer from offering dealerships incentives or promotions "without making the offer available to all" dealers.

Plaintiffs allege that GM "failed to offer the same VPP program benefits, incentives, terms and conditions to the plaintiffs as it offers to all of the other dealers in the Country" because GM imposed the new verification procedures. (ECF No. 13, PageID.104.) Under the new verification procedures imposed in June 2019, Plaintiffs allege they were not permitted to self-authenticate a customer's eligibility as a GM employee, former employee, or family member; Plaintiffs' sales team were required to obtain "personal, private, and protected information from their customers" in order to verify eligibility, and Plaintiffs were required to submit that material to GM for approval to process the VPP pricing. (*Id.*) Plaintiffs allege these measures were racist, discriminatory, and resulted in disparate treatment of their customers based on their race and ethnicity. (*Id.*) Plaintiffs allege that on information and belief, "numerous other dealers throughout the County, who were accidentally or intentionally out of trust on numerous occasions, were still permitted by defendants to retain their dealer floor plan pricing with GMF." (*Id.* at PageID.105.)

GM argues that verification measures do not constitute making a promotional offer "unavailable" to Plaintiffs. They cite, for example, a Sixth Circuit decision affirming summary judgment in favor of General Motors in another case challenging VPP documentation requirements under Ohio law. *See Sims Buick-GMC Truck, Inc. v. Gen. Motors LLC*, 876 F.3d 182, 186 (6th Cir. 2017).

Whether GM is right or wrong about the term "unavailable," there is a more fundamental problem with Plaintiffs' claim. Plaintiffs' allegation that GM failed to offer Plaintiffs the same

VPP program available to "all of the other dealers in the Country" is overly vague and conclusory. The strongest version of Plaintiffs' argument is that GM's enhanced verification procedures for the VPP program at Plaintiffs' dealerships are so unfair (in substance and procedure) that they constitute an altogether different program than the VPP incentives offered at all other dealerships in the United States. But Plaintiffs do not offer any allegations to back up this speculation. Plaintiffs do not allege any specific facts regarding the enforcement of the VPP system at any other dealership; they only speculate. Nor do they allege any facts that might raise a plausible inference that GM applied the new verification program to Plaintiffs' dealership differently than it does with any other dealership, or that, for example, GM imposes stricter verification requirements on minority-owned dealerships. So Plaintiffs' allegation that GM does not make the same VPP program available to them that it does for the rest of the country does not "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555; *HDC*, 675 F.3d at 614 ("[A] complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient."). Plaintiffs have failed to plausibly allege that GM has offered the VPP promotions selectively, "without making the offer available to all" dealers, including Plaintiffs. Counts III and IV are dismissed as to GM.

### 3. Preventing Reasonable Compensation (Count V)

Plaintiffs' final claim under the Michigan Motor Vehicle Franchise Act is based on Section 445.1574(1)(m), which provides that a manufacturer shall not "unfairly prevent a new motor vehicle dealer that sells, transfers, or exchanges a new motor vehicle dealership from receiving reasonable compensation for the value of the new motor vehicle dealership."

Plaintiffs allege that as a result of Defendants' "bad faith acts," Plaintiffs found themselves with "no dealer floor plan financing, with GMF, no ability to obtain alternative dealers floor plan

financing, no assistance from GM or GMF to obtain alternative dealer floor plan financing, no ability to buy vehicles and a rapid loss of customers." (ECF No. 13, PageID.107.) They allege that they had "no choice but to accept GM's feigned assistance in facilitating the distress sale of the Battle Creek Dealership." (*Id.* at PageID.108.) (Although both plaintiffs assert this allegation, it was TRBR II that owned the Battle Creek Dealership, and so only TRBR II has standing to pursue this claim.) But "GM's proxy then cancelled the purchase, without reason[,] causing further financial injury to plaintiffs." (*Id.*)

The amended complaint does not allege facts that meet the essential elements of this claim. The statute provides that a manufacturer shall not (a) "unfairly prevent . . . from receiving reasonable compensation" (b) "a new motor vehicle dealer" that (c) "sells, transfers, or exchanges a new motor vehicle dealership." Mich. Comp. Laws § 445.1574(1)(m). TRBR II does not allege that GM "unfairly prevented" it from receiving reasonable compensation or that it sold or transferred its dealership. Taking the allegations in a light most favorable to TRBR II, it has not alleged any facts that would render GM's conduct during the attempted sale "unfair." TRBR II speculates in the response brief that GM undermined their business by imposing the new restrictions on the VPP program in order to force TRBR II to sell the Battle Creek dealership, but speculation does not support a plausible claim. "[A] suspicion of a legally cognizable right of action is insufficient." *HDC*, 675 F.3d at 614 (quoting *Bishop*, 520 F.3d at 519).

Plaintiffs have described a sale falling through, as many sales do. Plaintiffs have not alleged a plausible claim under Michigan Motor Vehicle Franchise Act under Section 445.1574(1)(m). Count V is dismissed as to GM.

### E.  Breach of Contract (Count IX)

Count IX is a breach of contract claim against GM. (ECF No. 13, PageID.115.)

Plaintiffs do not identify in their allegations any specific contractual term that GM has allegedly breached. (*See* ECF No. 13, 24.) To state a claim for breach of contract, a plaintiff must allege "the existence and terms of a contract, that the defendant breached its terms, and that the breach caused damages to the plaintiff." *Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192, 202 (Mich. Ct. App. 2017) (citing *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014)). It is not for the Court to go through the entirety of the referenced Dealer Agreements to determine whether some unidentified provision has been breached in the manner alleged.

Because Plaintiffs have not alleged GM breached the terms of their contract, Plaintiffs have not stated a claim for breach of contract. Plaintiffs' breach of contract claim (Count IX) against GM is dismissed.

### F.  Breach of Good Faith and Fair Dealing (Count XII)

Count XII is a breach of good faith against GM. (ECF No. 13, PageID.116–117.)

Michigan law "does not recognize such an independent cause of action." *Sims Buick-GMC Truck, Inc. v. Gen. Motors LLC*, 876 F.3d 182, 186 (6th Cir. 2017) (citing *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 279–80 (Mich. 2003)). Michigan "uses the principle of good faith to evaluate a party's established contractual obligations or statutory duties, not to create a freestanding right of action." *Id.* (citing *Gorman v. Am. Honda Motor Co., Inc.*, 839 N.W.2d 223, 233–35 (Mich. 2013).

Because Plaintiffs have not stated a breach of contract claim, they cannot maintain an independent cause of action for breach of good faith and fair dealing under Michigan law. Count XII is dismissed.

### G. Tortious Interference (Count XIV)

Count XIV is a tortious interference claim against GM. (ECF No. 13, PageID.118.)

Under Michigan law, the *Hart* doctrine bars a tort claim where the parties' relationship is governed by a contract. *Hart v. Ludwig*, 79 N.W.2d 895, 897 (Mich. 1956) ("[I]f a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not."); *see also Indus Concepts & Eng'g, LLC v. Superb Indus., Inc*., No. 15-cv-13150, 2016 WL 3913711 (E.D. Mich. July 20, 2016) (dismissing tortious interference claim as "indistinguishable from the contractual claim based on the same facts").

Plaintiffs' tortious interference claim against GM is similarly indistinguishable from their claims that GM breached its contractual duties (although, as noted above, Plaintiffs have not identified any contractual term that has been allegedly breached). "Under Michigan law, a defendant acting pursuant to a contract is liable in tort only if he or she 'owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations.'" *Ram Int'l. Inc. v. ADT Security Services, In*c., 555 F. App'x 493, 497 (6th Cir. 2014) (quoting *Fultz v. Union-Commerce Assocs*., 683 N.W.2d 587, 592 (Mich. 2004)). While Plaintiffs argue that GM's "affirmative wrongdoing" by imposing racially discriminatory requirements on Plaintiffs' operations is actionable, Plaintiffs have not identified any alleged duty held by GM that is distinct from its contractual obligations. (*See* ECF No. 24, PageID.505–508.) Plaintiffs have not stated a tortious interference claim against GM. Count XIV is dismissed.

### IV. Conclusion

Accordingly, the Court GRANTS IN PART AND DENIES IN PART General Motors' motion to dismiss Plaintiffs' claims for failure to state a claim. (ECF No. 19.) Specifically:

- GM's Motion to Dismiss is DENIED with respect to Plaintiffs' claim under the Automobile Dealer's Day in Court Act (Count VIII) and the Sherman Act (Count VIII).

- GM's Motion to Dismiss is GRANTED with respect to all other claims against GM. Plaintiffs' claims against GM under 42 U.S.C. § 1981 (Count XV), the Michigan Motor Vehicle Franchise Act (Counts I–VI), breach of contract (Count IX), breach of good faith and fair dealing (Count XII), and tortious interference (Count XIV) are DISMISSED.[3]

SO ORDERED.

Dated: March 26, 2021

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

---

[3] The Court is putting the parties on notice that, having now fully analyzed the claims and having a better understanding of the disparate nature of the federal and state claims, it may not continue to exercise supplemental jurisdiction over the state law claims.